UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| | ) |
| VS. | ) Cause No. SA-09-CR-254-XR |
| | ) |
| JOSE RICARDO ALVARADO | ) |

**ORDER**

On this day came on to be considered Defendant's motion to suppress.

**FACTS**

United States Border Patrol Agent Mejia has been a border patrol agent for over 30 years. He testified he has a "high apprehension rate for San Antonio." He estimates that he averages 100 arrests per year. He further testified that he has "been able to learn the area, the highways, and the different manners that are used to smuggle aliens and [he has] become very good at it."

On March 24, 2009, Agent Mejia was patrolling IH 35 north of New Braunfels, Texas. Near the intersection of IH 35 and Kolenberg Road, Agent Mejia was patrolling the north bound lanes of IH 35. Agent Mejia testified that he was patrolling the IH 35 corridor because it is "popular with smugglers." He further testified that the Border Patrol has obtained a "large percentage" of cases "off of that corridor over the last 20 years." He estimated that he has arrested "several thousand" aliens or smugglers in that area. He opined that San Antonio is a "major hub for smuggling of all kinds, narcotics and alien smuggling, [and that] there are significant amounts of drop houses, stash houses ... by the interstates that are being used as drop-off points and pick-up points...."

1

IH 35 and Kolenberg Road is approximately 170 miles from the U.S.- Mexico border. It is approximately 130 miles from the nearest Border Patrol checkpoint station.

At about 9:00 a.m., near the intersection of IH 35 and FM 306, Agent Mejia saw a silver sports utility vehicle driving on IH 35. Agent Mejia testified that he observed that the Hispanic-looking driver and Hispanic-looking front passenger "were extremely nervous, they were stoic, they were focused on the roadway, they weren't acting normally." He further testified that they "wouldn't look at me, wouldn't look at the speedometer, they weren't doing anything that indicated it was a normal routine day for them, they just seemed stressed out."

As they drove past, Agent Mejia testified that he noticed "the vehicle was lower in the back." He testified that the vehicle was "significantly lower in the rear." He stated that the Border Patrol phrase was "dragging his bumper." This does not mean that the vehicle was actually dragging the bumper, but he opined that the bumper was four to five inches from the pavement.

Agent Mejia began to follow the vehicle. Agent Mejia acknowledged that the vehicle was not speeding, and no traffic infractions took place. There were no "be on the lookout ('Bolo')" or other intelligence warnings issued for the silver SUV. The vehicle did not take any evasive actions or attempt to flee.

Agent Mejia drove alongside the driver and noticed he was still "stoic, still posed on the roadway, [and] he had a good grip on the wheel." Agent Mejia testified that he could not see anything inside the vehicle that would cause the vehicle to ride low. He did not see any seats in the back of the vehicle. Agent Mejia testified that the passenger in the front seat "was very nervous, he seemed to be -- he almost looked like a kidnaped victim he was so stressed out, you know, his eyes were really wide open, so he was under a lot of duress...." Agent Mejia noted that neither the driver or passenger

would make eye contact.[1]

Based upon his observations, Agent Mejia decided to stop the vehicle. When Agent Mejia exited his vehicle and approached the silver SUV, he saw several individuals lying side by side in the back of the vehicle. He then conducted a field interview and determined that the front passenger and five individuals lying in the back were Mexican nationals and they did not have legal authority to enter and be present in the United States.

The driver, Defendant Jose Ricardo Alvarado, was determined to be an American citizen. He was arrested and advised of his *Miranda* rights. After acknowledging he understood his rights he later made a verbal statement claiming he "knew what he was doing, he needed the money, he was desperate for money, he was out of work, his dad was in the hospital, that he knew what he was doing and he would like to get off with a warning." He later provided a written statement to ICE Agent Don Talley.

Defendant, relying upon *U.S. v. Shipp*, 566 F. 2d 528 (5th Cir. 1978), argues that a driver looking "stoic" or "nervous" in a vehicle riding low does not constitute a "particularized and objective basis for suspecting that a crime has been committed."

## ANALYSIS

Roving border patrol traffic stops are governed by a Fourth Amendment analysis enunciated by the Supreme Court in *United States v. Brignoni-Ponce*, 422 U.S. 873 (1975). *See United States v. Inocencio*, 40 F.3d 716, 722 (5th Cir. 1994) ("Due to the fact that this case involves a roving

---

[1] The Defendant proffered the deposition of the front seat passenger, Mario Nunez. He testified that he had been sleeping off and on during the entire time he was in the vehicle. Mr. Nunez testified that he was sleeping or was "half asleep" when he noticed that the vehicle had pulled over and Agent Mejia approached the vehicle. Accordingly, Defendant implies that Agent Mejia's testimony regarding the passenger looking stoic, stressed out or nervous is erroneous.

Border Patrol stop, our analysis is guided by the principles enunciated by the United States Supreme Court in [the case of *Brignoni-Ponce*]"). Under the *Brignoni-Ponce* standard, the "Border Patrol officers on roving patrol may temporarily detain vehicles for investigation only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicle is involved in illegal activities." *See, e.g., Inocencio*, 40 F.3d at 722 (emphasis supplied) (*quoting United States v. Cardona*, 955 F.2d 976, 977 (5th Cir. 1992); *Brignoni-Ponce*, 422 U.S. at 884); *United States v. Cortez*, 449 U.S. 411, 417 (1981) ("An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity"); *see also United States v. Morales*, 191 F.3d 602, 603-04 (5th Cir. 1999) (stating that "officers on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain, inter alia, aliens who may be illegally in the country"). Under this standard, "[r]easonable suspicion requires more than a mere unparticularized hunch, but considerably less than proof by a preponderance of the evidence." *United States v. Hernandez*, 477 F.3d 210, 213 (5th Cir. 2007).

Factors that may be considered in the reasonable suspicion analysis include: (1) proximity to the border; (2) characteristics of the area; (3) usual traffic patterns; (4) agent's previous experience in detecting illegal activity; (5) behavior of the driver; (6) particular aspects or characteristics of the vehicle; (7) information about recent illegal trafficking in aliens or narcotics in the area; and (8) the number, appearance, and behavior of the passengers. *See United States v. Jacquinot*, 258 F.3d 423, 427 (5th Cir. 2001) (*citing United States v. Brignoni-Ponce*, 422 U.S. 873, 884-85 (1975)). The reasonable suspicion analysis reviews the totality of the circumstances. *See Jacquinot*, 258 F.3d at

427-28 ("The reasonable suspicion analysis is a fact-intensive test in which the court looks at all circumstances together to weigh not the individual layers, but the laminated total"); *United States v. Moreno-Chaparro*, 180 F.3d 629, 631-32 (5th Cir. 1998) ("No single factor is determinative; the totality of the particular circumstances must govern the reasonableness of any stop by roving border patrol officers"). *see also Morales*, 191 F.3d at 603-04 ("Obviously, only those factors known to the officer at the time of the stop can be considered when determining whether the stop was reasonable."). The Fifth Circuit has advised that "in all situations the officer is entitled to assess the facts in light of his experience in detecting illegal entry, smuggling, or other criminal activity." *Morales*, 191 F.3d at 604 (*citing United States v. Aldaco*, 168 F.3d 148, 151 (5th Cir. 1999)). "Factors that ordinarily constitute innocent behavior may provide a composite picture sufficient to raise reasonable suspicion in the minds of experienced officers." *Jacquinot*, 258 F.3d at 427-28.

    **A.**    **Distance from the Border**

As indicated above, the silver SUV was stopped approximately 170 miles from the border. At the time Agent Mejia stopped the vehicle he did not know whether the vehicle originated its journey at the border. Typically, the Fifth Circuit has stated that "[v]ehicles traveling more than fifty miles from the border are usually a 'substantial' distance from the border." *See United States v. Orozco*, 191 F.3d 578 (5th Cir. 1999) ("a car traveling more than fifty miles from the border is usually viewed as being too far from the border to support an inference that it originated its journey there") (*quoting United States v. Jones*, 149 F.3d 364, 368 (5th Cir.1998)).

However, according to the Fifth Circuit in *United States v. Ceniceros*, 204 F.3d 581, 584 (5th Cir. 2000), "[c]lose proximity to the border is not required if other specific articulable facts support a finding of reasonable suspicion." The Fifth Circuit cautioned, however, that in that instance, the

"facts offered by the government to support a reasonable suspicion will be examined charily," with great caution. *Orozco*, 191 F.3d at 582 ("Moreover, we look at the remaining factors most carefully to ensure the stop complied with the requirements of the Fourth Amendment") (*citing United States v. Rodriguez-Rivas*, 151 F.3d 377, 380 (5th Cir. 1998).

### B. Articulable facts alleged by the Government

The Government argues that Special Agent Mejia saw two Hispanic-looking individuals looking "stoic" or "nervous." They were traveling on an interstate highway known to be used by smugglers. Their vehicle was "riding low." Accordingly, the Government argues that there was a "particularized and objective basis for suspecting that a crime has been committed."

### C. Recent Fifth Circuit cases

In *U.S. v. Salazar*, 178 Fed. Appx. 397 (5th Cir. 2006), the Court denied the defendant's motion to suppress noting that Salazar was traveling on a common smuggling route that avoids immigration checkpoints, shortly after midnight; Salazar was driving well below the speed limit, applied his brakes rapidly when he first encountered the agents' marked patrol vehicle, slowed down and pulled to the side of the road to allow the agents to pass, and fell further back when the agents slowed down to allow him to pass. Salazar's vehicle was a newer model Suburban with darkly tinted windows and excessive visible condensation despite containing only two visible occupants. Similarly, in *U.S. v. Valencia*, 224 F.3d 765 (5th Cir. 2000), the van was traveling in a northerly direction in an area in close proximity to the border and that was known by the agents to be frequented by transporters of illegal aliens. In stark contrast with its riding very low in the rear, the van appeared to have only two occupants. The agents also believed that the van had condensation on its windows. With regard to the fact that the van was "riding low," the Court noted the van was apprehended four

miles from the border, having been first sighted one mile from the border.

In *U.S. v. Galvan-Torres*, 350 F.3d 456 (5th Cir. 2003), the Court denied the defendant's motion to suppress noting that Galvan's vehicle was within 50 miles of the Mexican border. Galvan was driving in close proximity to a pickup on a sparsely traveled road with a reputation as a smuggling route between midnight and 1:00 a.m. After encountering Galvan's vehicle, Agent Upton turned around and found the pickup abandoned on the side of the road with its occupants fleeing and Galvan's vehicle nowhere in sight, leading Agent Upton to surmise that Galvan's vehicle had sped away.

The above cases all deal with cases where the vehicle was within fifty miles of the border.[2] The drivers of the vehicles all engaged in suspicious driving patterns. In the first two cases, although only two passengers were seen in the vehicles, condensation in the vehicles gave the agents suspicion that there were other passengers inside.

In *U.S. v. Chavez-Chavez*, 205 F.3d 145 (5th Cir. 2000), the Court affirmed denial of a motion to suppress where the vehicle was 150 to 160 miles from the Texas-Mexico border and about 50 miles north from the Sarita Border Patrol checkpoint. The Court first considered the characteristics of the area where the vehicle was encountered. Border Patrol agents testified that smugglers frequently used Highway 286 to circumvent the Sarita checkpoint and the more heavily patrolled Highway 77.[3]

---

[2]The Fifth Circuit has stated that proximity to the border is a "paramount factor" in determining reasonable suspicion. *U.S. v. Orozco*, 191 F.3d 578, 581 (5th Cir. 1999) ("Although we do not employ a bright line test with regard to this first factor, 'a car traveling more than fifty miles from the border is usually viewed as being too far from the border to support an inference that it originated its journey there.' *United States v. Jones*, 149 F.3d 364, 368 (5th Cir.1998). In this case, the stop took place some 200-300 miles away from the border. Consequently, we cannot consider this factor as cutting in favor of a finding of reasonable suspicion.").

[3] The Court also noted that "Highway 286 is also legitimately used, however, by thousands of people who live in South Texas and travel to Corpus Christi, and the fact that a road has been used by alien smugglers is alone insufficient to justify a stop." *Id* at 148.

Turning its attention to the usual traffic patterns on Highway 286, the Court noted that the agents testified that illegal aliens often travel north on Highway 286 at 8:00 a.m., the approximate time of the stop at issue.[4] With regard to the appearance of the passengers, the Court noted that the "Border Patrol agents could have reasonably inferred from the early morning time of the traffic stop taken with the unclean appearance of the passengers in the van, at least their appearance from the mid-chest up, that the passengers may have recently spent some time in the area's surrounding wilderness, as illegal aliens in that area often do." *Id.* at 148-49. Evaluating the agents' previous knowledge and experience in dealing with criminal activity, the Court noted that the agents had many years of experience patrolling the border. Considering the driver's behavior, the Court noted that the agents testified that the driver glanced back at them as the van drove past the parked Border Patrol vehicle. The agents testified "that as they followed the van, the driver looked back at them in his side-view mirror and that Chavez appeared nervous, frequently looking back at them."[5] Finally, with regard to the appearance of the vehicle, the agents "testified that the van appeared to have a modified suspension to prevent it from sagging, which is common in vehicles used to transport illegal aliens. The rigid suspension would prevent the van from appearing weighted down even if it were carrying a heavy load of people or

---

[4]Again, the Court cautioned that "traveling on Highway 286 at 8:00 in the morning by itself is not unusual, however, as many law-abiding people do so daily. A factual condition that is consistent with alien smuggling does not provide reasonable suspicion if that condition also occurs even more frequently in the law-abiding public." *Id.*

[5]"Yet, the agents did not testify that Chavez was speeding, driving erratically, trying to evade the officers or violating any state traffic laws. Whether a driver looks at an officer or not should not be accorded much weight. *See United States v. Moreno-Chaparro*, 180 F.3d 629, 632 (5th Cir.1998) ('we are persuaded in the ordinary case, whether a driver looks at an officer or fails to look at an officer, taken alone or in combination with other factors, should be accorded little weight.')." *Id.* at 149.

contraband." *Id.* at 149.

The Fifth Circuit also affirmed a denial of a motion to suppress in *U.S. v. Orozco*, 191 F.3d 578 (5th Cir. 1999). In *Orozco*, a Border Patrol agent was parked on I-20 near Penwell, Texas, which is located 200-300 miles from the United States-Mexico border. The agent testified he "observed a 1988 Ford 'supercab' pickup truck, with what he at first believed to be three occupants, traveling east on I-20. The person in the passenger seat (later determined to be Orozco) was slumped over, while the driver was looking straight ahead. Additionally, the truck had a blue tarp pulled over the bed of the truck, and the truck was riding low. Bollier subsequently pulled out and began following the truck. He noticed that the truck was weaving back and forth across the road, suggesting to the agent that the truck was carrying a heavy load." *Id.* at 579. Although the agent stopped the vehicle suspecting that it was harboring illegal aliens, the agent later discovered large quantities of marijuana. The Court noted that certain "'[a]spects of the vehicle itself', most notably that the truck 'appear[ed] to be heavily loaded,' justified Bollier's reasonable suspicion. *Brignoni-Ponce*, 422 U.S. at 885, 95 S. Ct. 2574. Bollier initially noticed that the truck bed was completely covered by a tarp, which is a common technique employed by smugglers to hide illegal aliens. He next noticed that the truck was weaving and bouncing on the road and that the tires were under inflated-suggesting the truck bed was carrying a heavy cargo. In addition, the spare tire was placed in the back seat of the truck as if to make room for a large amount of cargo in the bed of the truck-another trait common to illegal alien smugglers." *Id.* at 582. With regard to the driver's behavior[6], the agent drove alongside the driver and honked his

---

[6]The Court made the following additional statement about driver behavior: "Moreover the avoidance of eye contact may or may not be entitled weight; and it is simply one factor to consider in observing overall behavior. *United States v. Nichols*, 142 F.3d 857, 868 (5th Cir.1998). Although some of the factors relied on by the trial judge would not alone amount to reasonable suspicion, reasonable suspicion determinations are not limited to analysis of one

9

horn to get the driver's attention, "however, this attempt to grab the driver's attention failed-yet another sign that something was amiss." *Id.*

>  D. **The articulable facts provided by the Government fail to establish a particularized and objective basis for suspecting that a crime has been committed.**

In this case there is no proximity to the border. The vehicle is traveling on a stretch of IH 35 used by many law-abiding people. The vehicle is traveling during the morning hours, a time period consistent with the commute of many individuals. None of these factors weighs in favor of the Government. These facts are not inconsistent with the day-to-day activities of persons engaged in lawful business; they do not indicate criminal activity. *U.S. v. Shipp*, 566 F.2d 528, 529 (5th Cir. 1978). The agent's previous experience in detecting illegal activity does weigh in favor of the Government. Agent Mejia testified that he made thousands of arrests.[7] With regard to the behavior of the driver and passenger, Agent Mejia testified that they looked both stoic[8] and nervous. This does not appear possible. Unlike *U.S. v. Chavez-Chavez*, there was no testimony from Agent Mejia that either the driver or passenger appeared unkempt or spent some time in the brush. With regard to the vehicle appearing weighted down, this factor could favor the Government. However, in this case, any number of legitimate items could have been located in the vehicle to give the appearance the vehicle was "riding low." The other factors do not support the Government. There were no other unusual

---

factor." *Id.*

[7]The Court notes, however, that numerous arrests alone without knowing what percentage of stops are made that result in no arrest is of limited value.

[8]Stoic has been defined by the American Heritage Dictionary as "One who is seemingly indifferent to or unaffected by joy, grief, pleasure, or pain." See also Webster's ("Not affected by passion; manifesting indifference to pleasure or pain.").

aspects or characteristics of the vehicle, and there were was no other information about recent illegal trafficking in aliens or narcotics in the area. Left unsaid by any of the parties is that the fact that because the passenger and driver appeared Hispanic, the agent had the "hunch" that something was amiss. It is very unlikely that the vehicle would have been stopped if the passenger and driver were not of Hispanic origin.

The Court finds that the agent in this case did not have specific articulable facts, together with rational inferences from those facts, to reasonably warrant suspicion that the vehicle contained aliens who may be illegally in the country.

## CONCLUSION

For the reasons stated above, the Court hereby GRANTS Defendant's motion to suppress.

SIGNED this 18th day of May, 2009.

_____

XAVIER RODRIGUEZ

UNITED STATES DISTRICT JUDGE